**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

**UNITED STATES OF AMERICA**
      **Plaintiff,**

    v.                                                    **Case No. 16-CR-128**

**CASIMIR McMURTRY**
      **Defendant.**

## STATEMENT OF REASON MEMORANDUM

Defendant Casimir McMurtry participated in the armed robbery of a Family Dollar Store and a Walgreen's Pharmacy location. He pleaded guilty to two Hobbs Act violations, 18 U.S.C. § 1951(a), and one violation of 18 U.S.C. § 924(c), and I set the case for sentencing. In imposing sentence, the district court must first determine the defendant's imprisonment range under the guidelines, then make an individualized assessment of the appropriate sentence based on the factors set forth in 18 U.S.C. § 3553(a). E.g., United States v. Kappes, 782 F.3d 828, 837 (7th Cir. 2015).

## I. GUIDELINE CALCULATION

Defendant's pre-sentence report ("PSR") set a base offense level of 20 on the first robbery count, U.S.S.G. § 2B3.1(a), then added 6 levels under § 2B3.1(b)(2)(B) because a firearm was "otherwise used" when defendant and his co-actor pointed their guns at the victim-employees while demanding money. On the second robbery, the PSR set a base level of 20, but declined to impose an enhancement for use of a firearm because defendant had been convicted of a § 924(c) violation arising out of this offense. See U.S.S.G. § 2K2.4 cmt. n.4. After applying the multi-count adjustment under U.S.S.G. § 3D1.4, and subtracting 3 levels for

acceptance of responsibility, U.S.S.G. § 3E1.1, the PSR set a final offense level of 24 on the robberies counts. Coupled with defendant's criminal history category of III, this produced a guideline range of 63-78 months on the robbery counts. The § 924(c) count required a sentence of 84 months consecutive, as the firearm was brandished. See U.S.S.G. § 2K2.4(a).

Defendant objected to the 6-level increase under § 2B3.1(b)(2)(B) on the first robbery count, arguing that a 5-level increase for "brandishing" under § 2B3.1(b)(2)(C) was more appropriate. He indicated that his conduct during this robbery consisted of standing by the door of the store and pointing a firearm at several people; the surveillance footage showed that he did not get close to anyone, kept the door propped open with his foot, and eventually crossed his arms, tucking his firearm into his armpit. Defendant further noted that he did not make any personalized threats to any specific victim.

The government responded that during this robbery defendant was armed with a .45 caliber pistol with an extended magazine, which he pointed at two victim-employees while standing near the entrance/exit door to the store. The government noted that while the exact distance between the door and the check-out counter was unclear, the registers were adjacent to the door such that one entering the store need only turn right and take a few steps before arriving at the counter. The government argued that defendant's pointing the weapon at the two employees trying to get money from the register in order to satisfy the robbers' demands created a personalized threat of harm, supporting the 6-level enhancement.

In United States v. Eubanks, 593 F.3d 645, 651 (7th Cir. 2010), the court explained that pointing a weapon at a specific victim creates a personalized threat of harm, warranting an "otherwise used" adjustment; conversely, brandishing typically occurs where a defendant generally displays a weapon or points the weapon at a group of people rather than a specific

2

individual. Here, defendant pointed his gun at two specific employees, rather just generally displaying it. Moreover, as the government also noted, defendant could under relevant conduct rules be held responsible for his co-actor's action of pointing his pistol at the employee behind the register, conduct reasonably foreseeable to defendant and thus appropriately attributable to him. See U.S.S.G. § 1B1.3(a)(1)(B). I therefore overruled the objection. However, I also stated that this dispute over 1 level under the guidelines would not affect the final sentence I imposed under § 3553(a). See United States v. Hawkins, 777 F.3d 880, 885 (7th Cir. 2015).

## II. SECTION 3553(a)

**A.     Sentencing Factors**

Section 3553(a) directs the sentencing court to consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the [advisory sentencing guideline range;]

(5) any pertinent policy statement . . . issued by the Sentencing Commission[;]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

3

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). The court must, after considering these factors, impose a sentence that is "sufficient but not greater than necessary" to satisfy the purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation of the defendant. Id.

While the court must as part of the analysis consider the sentence recommended by the guidelines, it "may not perfunctorily impose a guidelines sentence or even presume that such a sentence is appropriate in a given case." United States v. Warner, 792 F.3d 847, 855 (7th Cir. 2015). "Ultimately, it falls on the district court to weigh and balance the various factors and to 'make an individualized assessment based on the facts presented.'" Id. (quoting Gall v. United States, 552 U.S. 38, 50 (2007)).

**B.     Analysis**

    **1.     The Offenses**

On June 22, 2016, defendant and his two co-actors, Keyon Williams and Antonio Currin, drove to a Family Dollar Store location in Milwaukee to commit an armed robbery. They arrived in a black Chevrolet Cruze driven by Currin. Defendant and Williams, each wearing a mask covering his face and carrying a semi-automatic firearm, entered the store. Williams approached the counter, pointed his firearm at the victim-employee and demanded money. Defendant, armed with a .45 caliber semi-automatic firearm with an extended magazine, stood by the store's entrance door, pointing his firearm at two victim-employees. Williams placed a bag on the counter and demanded the victim-employees put money into the bag. One employee opened the register and handed the entire cash drawer to Williams. Williams and defendant then fled the Family Dollar Store, entered Currin's vehicle, and the defendants drove

away.

Later on that day, the defendants drove to a Walgreen's location in Milwaukee to commit another robbery. Again, Williams and defendant each wore a mask and carried a firearm. Upon entering the store, they both pointed firearms at the victim-employee. Williams approached the counter, while defendant remained by the store's entrance door. Williams yelled at the victim employee to "open the drawer", at which point she opened the drawer and handed Williams a stack of $1.00 bills wrapped with a strap and containing a GPS tracking device. Williams then yelled, "give me what's underneath the drawer." The victim-employee lifted the drawer and removed one $20 bill. Williams reached over the counter as the victim-employee gave the cash drawer to Williams. Williams and defendant fled the Walgreens, entered Currin's vehicle, and the defendants drove away.

The defendants then proceeded to a CVS Pharmacy location in Milwaukee. All three defendants exited the Cruze and entered the store. Meanwhile, the GPS tracker taken from the Walgreen's alerted the police that the defendants were inside the CVS. As officers entered the CVS, they passed an individual, later identified as Williams, who was exiting the store. Upon entering the CVS, police officers observed two individuals, later identified as defendant and Currin, using the coin machine inside the store. As officers confronted Currin, he disobeyed the officers' directions and tried to get past them. A physical altercation ensued, during which Currin dropped a loaded semi-automatic 9mm pistol on the floor. Currin was able to get past the officers by wriggling out of his jacket and running out the door.

While police officers were looking for Currin, they found Williams running in the area and placed him under arrest. During a search incident to arrest, officers located a stack of $1.00 bills with the GPS tracker from Walgreen's in Williams's right front pants pocket. Defendant

5

was arrested without incident at the CVS, and a search of his person turned up cash and a small amount of marijuana. Officers also searched the Chevrolet Cruze used by the defendants. On the front passenger seat of the vehicle, officers found the .45 semi-automatic with an extended magazine defendant used during the robberies. On the passenger floorboard, they found the bag used during the Family Dollar Store robbery. They also found the two cash register drawers on the rear seat behind the driver's seat.

### 2. The Defendant

The PSR and defense sentencing memorandum discussed defendant's upbringing, primarily by a single mother, as his father spent time in prison. He grew up in poor neighborhoods, with high rates of crime and lead poisoning. He struggled in school, with some physical abuse imposed at home as discipline. His grandmother, a source of support, died when he was 13. He started using marijuana around this time.

In 2009, when he was 17, defendant picked up his first criminal conviction, for possession of a short-barreled shotgun, for which he was sentenced to 1 year prison and 3 years extended supervision. He was then convicted of burglary in 2011, for which he was sentenced to 18 months in prison followed by 3 years extended supervision. During this burglary a variety of items were stolen from a residence, including two handguns.[1]

Defendant was released in February 2012 and seemed to do pretty well, completing his extended supervision in February 2015. He earned an HSED and took some classes at MATC from 2012 to 2013. Prior to his arrest for the instant offenses, he had been working as a stocker at a market, his first period of steady, full-time employment. He had a son in 2014 and

---

[1] In his memo, defendant provided an explanation for this offense, indicating that he entered the home of a relative as a prank, and other people looted the home.

6

seemed to be a committed parent. His girlfriend stated that he was a good father and good person, taking the initiative to spend time with her sons from a previous relationship.

However, defendant developed a problem with gambling, for which he needed money, and his drug use escalated, clouding his judgment. He blamed his involvement in the instant offenses on those issues. He stated that he was committed to a future that included working, not using drugs, and being around positive people. He was at the time of sentencing still young, just 25 years old.

### 3. The Sentence

Given the seriousness of the offenses, which were no doubt frightening to the victim-employees, a substantial prison sentence was needed to provide just punishment and to deter others. Prison was also needed to deter this defendant and to protect the public from him, given his prior record, which includes two previous felony convictions, including a firearm case, both of which produced terms of confinement.

I did take into account that both of these robberies occurred within a short period of time, no one was injured or restrained, a small amount of money was taken, and the police arrested the defendants shortly afterwards. Defendant did not resist or try to run away, like the other two did, and he timely accepted responsibility for his actions.

There were also some reasons to be hopeful that defendant could succeed in society. He was, aside from the gambling and drug use, doing pretty well prior to these offenses, working and spending time with his family, both his child and his girlfriend's children. He completed a period of state supervision from 2012 to 2015 and attempted to further his education. He appeared to have plans for the future, as well as strong family support.

Defendant did not have a history of violence, suggesting a reduced need to protect the

7

public. His longest previous prison sentence was 18 months, and even the minimum term on the § 924(c) count was several times longer, which was a factor in considering the need for specific deterrence. See United States v. Qualls, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005). Under Dean v. United States, 137 S. Ct. 1170 (2017), the court can consider the impact of the § 924(c) charge on the total sentence

Defendant suggested a shorter prison term, 84 months, followed by a longer term of supervision, six years. I agreed with that general outline. Given the mitigating circumstances discussed, a prison term along the lines the guidelines recommended would have been greater than necessary. It also appeared that defendant had significant correctional treatment needs, and that he had responded well to his last period of supervision. Supervision could help to ensure that he avoided gambling and drugs. I found that defendant's proposal somewhat understated the need for punishment for these two very serious crimes and overstated the need for supervision. I concluded that we would likely know after four years whether he had been able to make the transition and avoid drugs, gambling, and negative associates.

Under all the circumstances, I find a total sentence of 90 months' imprisonment, followed by four years of supervised release, sufficient but not greater than necessary to satisfy the purposes of sentencing. This sentence was based on § 3553(a) and would have been the same regardless of the guidelines and the objection.

### III. CONCLUSION

Therefore, I committed defendant to the custody of the Bureau of Prisons for a period of 6 months on the two robbery counts, running concurrently, followed by 84 months consecutive on the § 924(c) count, for a total of 90 months. I further required him to serve a period of four years supervised release on the § 924(c) count and three years on the robbery

8

counts.

Dated at Milwaukee, Wisconsin, this 22nd day of May, 2017

/s Lynn Adelman
LYNN ADELMAN
District Judge