# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
        **Plaintiff,**

   v.                                                    Case No. 16-CR-128

**CASIMIR McMURTRY**
        **Defendant.**

## DECISION AND ORDER

Defendant Casimir McMurtry moves for sentence modification pursuant to 18 U.S.C. § 3582(c)(1)(A). For the reasons that follow, I deny his motion.

### I. FACTS AND BACKGROUND

On June 22, 2016, defendant and two co-actors, Keyon Williams and Antonio Currin, drove to a Family Dollar Store location in Milwaukee to commit an armed robbery. They arrived in a black Chevrolet Cruze driven by Currin. Defendant and Williams, each wearing a mask covering his face and carrying a semi-automatic firearm, entered the store. Williams approached the counter, pointed his firearm at a victim-employee and demanded money. Defendant, armed with a .45 caliber semi-automatic firearm with an extended magazine, stood by the store's entrance door, pointing his firearm at two victim-employees. Williams placed a bag on the counter and demanded the victim-employees put money into the bag. One employee opened the register and handed the entire cash drawer to Williams. Williams and defendant then fled the Family Dollar Store, entered Currin's vehicle, and the defendants drove away.

Later on that day, the defendants drove to a Walgreen's location in Milwaukee to commit

another robbery. Again, Williams and defendant each wore a mask and carried a firearm. Upon entering the store, they both pointed firearms at the victim-employee. Williams approached the counter, while defendant remained by the store's entrance door. Williams yelled at the victim employee to "open the drawer," at which point she opened the drawer and handed Williams a stack of $1.00 bills wrapped with a strap and containing a GPS tracking device. Williams then yelled, "give me what's underneath the drawer." The victim-employee lifted the drawer and removed one $20 bill. Williams reached over the counter as the victim-employee gave the cash drawer to Williams. Williams and defendant fled the Walgreen's, entered Currin's vehicle, and the defendants drove away.

The defendants then proceeded to a CVS Pharmacy location in Milwaukee. All three defendants exited the Cruze and entered the store. Meanwhile, the GPS tracker taken from the Walgreen's alerted the police that the defendants were inside the CVS. As officers entered the CVS, they passed an individual, later identified as Williams, who was exiting the store. Upon entering the CVS, police officers observed two individuals, later identified as defendant and Currin, using the coin machine inside the store. As officers confronted Currin, he disobeyed the officers' directions and tried to get past them. A physical altercation ensued, during which Currin dropped a loaded semi-automatic 9mm pistol on the floor. Currin was able to get past the officers by wriggling out of his jacket and running out the door.

While police officers were looking for Currin, they found Williams running in the area and placed him under arrest. During a search incident to arrest, officers located a stack of $1.00 bills with the GPS tracker from Walgreen's in Williams's right front pants pocket. Defendant was arrested without incident at the CVS, and a search of his person turned up cash and a small amount of marijuana. Officers also searched the Chevrolet Cruze used by the

2

defendants. On the front passenger seat of the vehicle, officers found the .45 semi-automatic with an extended magazine defendant used during the robberies. On the passenger floorboard, they found the bag used during the Family Dollar Store robbery. They also found the two cash register drawers on the rear seat.

Defendant pleaded guilty to two Hobbs Act violations, 18 U.S.C. § 1951(a), and one violation of 18 U.S.C. § 924(c), and on May 19, 2017, I sentenced him to a total of 90 months in prison. Given the seriousness of the offenses, I concluded that a substantial prison sentence was needed to provide just punishment and to deter others. Prison was also needed to deter defendant and to protect the public from him, given his prior record, which included two previous felony convictions, including a firearm case, both of which produced terms of confinement. I did take into account that both of the robberies occurred within a short period of time, no one was injured, a small amount of money was taken, and the police arrested the defendants shortly afterwards; defendant did not resist or try to run away, like the other two did, and he timely accepted responsibility for his actions. I further noted that defendant did not have a history of violence, and that his longest previous prison sentence was just 18 months. See United States v. Qualls, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005); see also Dean v. United States, 137 S. Ct. 1170 (2017). Defendant is currently serving his sentence at FCI Oxford, with a projected release date of November 13, 2022.

On November 23, 2020, defendant filed a pro se motion to reduce his sentence. I referred the matter to Federal Defender Services ("FDS") pursuant to the court's standing order regarding First Step Act motions, but FDS declined to supplement the pro se submission. I then directed the government to respond and permitted defendant to reply. The matter is ready for decision.

3

Case 2:16-cr-00128-LA   Filed 02/16/21   Page 3 of 14   Document 86

## II. DISCUSSION

### A. Compassionate Release Standards

Section 3582(c)(1)(A) authorizes the district court to grant what is commonly known as "compassionate release." The statute provides, in pertinent part:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i).

The statute contains three requirements: (1) the defendant must first make a request to the warden before applying to the court; (2) the defendant must then demonstrate to the court that "extraordinary and compelling reasons" warrant a reduction in his sentence; and (3) the court must determine whether, even if such reasons are shown, a reduction of the sentence would be inconsistent with the applicable 18 U.S.C. § 3553(a) factors. United States v. Cole, No. 08-CR-327, 2021 U.S. Dist. LEXIS 2404, at *5 (E.D. Wis. Jan. 7, 2021).

#### 1. Exhaustion

Before 2018, the court could grant compassionate release only on a motion from the BOP. United States v. Sanford, No. 20-2445, 2021 U.S. App. LEXIS 2039, at *6 (7th Cir. Jan. 25, 2021). However, the First Step Act of 2018 amended the compassionate release statute

4

to permit the court to adjudicate a motion directly from the defendant—provided, however, that the defendant must first present his request for compassionate release to the warden and exhaust administrative appeals (if the request is denied) or wait 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier. Id. The Seventh Circuit has held that, while this "exhaustion" requirement is not jurisdictional, it is a mandatory claim-processing rule which must be enforced if raised by the government. Id. at *7; see also United States v. Williams, No. 20-2404, 2021 U.S. App. LEXIS 3762, at *4 (7th Cir. Feb. 10, 2021) (holding that "an inmate is required to present the same or similar ground for compassionate release in a request to the Bureau as in a motion to the court").

### 2. Extraordinary and Compelling Reasons

The statute does not define the term "extraordinary and compelling reasons." Rather, Congress instructed the Sentencing Commission, in promulgating general policy statements regarding the sentence modification provisions in § 3582(c)(1)(A), to describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. See 28 U.S.C. § 994(t).[1] The Commission's policy statement provides:

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the

---

[1]Congress did state that: "Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." Id. Courts have held that "while rehabilitative efforts alone will not support compassionate release, the court may take such efforts into account as part of the analysis." United States v. Anderson, No. 14-CR-186, 2020 U.S. Dist. LEXIS 187983, at *13 (E.D. Wis. Oct. 8, 2020); see also United States v. Hudson, 967 F.3d 605, 613 (7th Cir. 2020) (noting that the court may in deciding a First Step Act motion consider the defendant's post-sentencing conduct as part of the § 3553(a) analysis).

5

factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—

(1)   (A) extraordinary and compelling reasons warrant the reduction . . .

(2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3) the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13. The commentary to the policy statement indicates that extraordinary and compelling reasons exist under these circumstances:

(A) Medical Condition of the Defendant.—

(i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family Circumstances.—

(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

6

> > (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.
>
> (D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13 cmt. n.1.

The Commission has not updated the policy statement, which purports to require a motion from the director of the Bureau of Prisons, see U.S.S.G. § 1B1.13 cmt. n.4, since the passage of the First Step Act, which allowed defendants to bring their own motions. Accordingly, "because the Guidelines Manual lacks an applicable policy statement, the trailing paragraph of §3582(c)(1)(A) does not curtail a district judge's discretion." United States v. Gunn, 980 F.3d 1078, 1080 (7th Cir. 2020); see also United States v. Brooker, 976 F.3d 228, 237 (2d Cir. 2020) ("[T]he First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release. Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion.").

The statute requires the defendant to establish that his situation is extraordinary, i.e., beyond what is usual, customary, or regular, and his need for release compelling, i.e., irreparable harm or injustice will result if relief is not granted. United States v. Scott, 461 F. Supp. 3d 851, 862 (E.D. Wis. 2020). "The substantive aspects of the Sentencing Commission's analysis in §1B1.13 and its Application Notes provide a working definition of 'extraordinary and compelling reasons'[.] In this way the Commission's analysis can guide discretion without being conclusive." Gunn, 980 F.3d at 1080.

In the context of the COVID-19 pandemic, courts have found that modification may be warranted if the prisoner demonstrates that he is particularly vulnerable to the virus based on his age, health status, or other specific circumstances; on the other hand, courts have tended to deny compassionate release requests based on general concerns about possible exposure in prison. E.g., United States v. Dover, No. 14-CR-196, 2020 U.S. Dist. LEXIS 133340, at *16-17 (E.D. Wis. July 28, 2020); see also United States v. Thomas, No. 1:11-CR-22, 2020 U.S. Dist. LEXIS 172963, at *6-7 (N.D. Ind. Sept. 22, 2020) (explaining that § 3582(c)(1)(A) contemplates a sentence reduction based on the particular circumstances of where the defendant is housed and his personal health conditions). Courts have in evaluating medical conditions during the pandemic relied on guidance from the CDC, while also recognizing that each case must decided on its own facts. See, e.g., United States v. Krueger, No. 09-CR-103, 2021 U.S. Dist. LEXIS 27723, at *16 (E.D. Wis. Feb. 12, 2021).

### 3.  Section 3553(a) Factors

Finally, if the court decides that extraordinary and compelling reasons have been shown, it must also consider the applicable § 3553(a) factors to determine whether the sentence should be modified. See United States v. Saunders, No. 20-2486, 2021 U.S. App. LEXIS 3398, at *4 (7th Cir. Feb. 8, 2021) ("Because of the importance of the § 3553(a) factors, courts are not compelled to release every prisoner with extraordinary and compelling health concerns.").

The factors include: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for the sentence imposed to provide just punishment, deterrence, protection of the public, and correctional treatment; (3) the kinds of sentences available; (4) the sentencing guideline range; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities;

8

and (7) the need to provide restitution to the victims of the offense. 18 U.S.C. § 3553(a). In some cases, a court may find that the relevant § 3553(a) factors outweigh the extraordinary and compelling reasons warranting compassionate release and/or that release would undermine the goals of the original sentence. United States v. Bartlett, No. 06-CR-273, 2020 U.S. Dist. LEXIS 101393, at *13-14 (E.D. Wis. June 9, 2020).

**B.    Defendant's Motion**

    **1.    Exhaustion**

On October 18, 2020, defendant made a request for compassionate release to the warden, citing COVID-19 concerns. Specifically, he stated that he has borderline hypertension, a CDC-listed comorbidity, and that he cannot socially distance and protect himself while in custody. (R. 82-1.) The warden denied his request on October 28, 2020 (R. 82-2), and more than 30 days have passed. The government concedes that defendant has satisfied the exhaustion requirement. (R. 82 at 5-6.)

    **2.    Extraordinary and Compelling Reasons**

In his motion filed with the court, defendant seeks compassionate release due to a significant risk of death or severe illness from COVID-19. (R. 78 at 1.) He states that he is confined in an over-crowded facility, precluding social distancing, which has experienced a severe outbreak. (R. 78 at 1-2, 13.) He indicates that he is 29 years old with a CDC-listed comorbidity of obesity, which makes him extremely vulnerable to the virus. (R. 78 at 2.) He further indicates that he tested positive for COVID-19 on October 8, 2020, and that the BOP failed to provide adequate medical care, with staff telling him to purchase over-the-counter Tylenol. (R. 78 at 3; R. 78-1 at 6.) He notes that, while the science is still evolving, the

9

research suggests that it is possible to become re-infected; he also notes that some people have long lasting effects, even in mild cases. (R. 78 at 4; R. 85 at 5.) Finally, defendant contends that he has used his time in prison productively, participating in educational programming and drug counseling while avoiding discipline, and that he has a residence to return to and plans for employment. (R. 78 at 5; R. 78-1 at 2, release plan; R. 78-1 at 3-5, certificates.)

The CDC has recognized that obese persons (i.e., those with a "Body Mass Index" or "BMI" of 30 or greater) are at increased risk of severe illness from COVID-19.[2] But this does not mean that every inmate with a BMI of 30 or greater must be released from prison. See United States v. Meyer, No. 14-CR-230, 2020 U.S. Dist. LEXIS 199117, at *20 (E.D. Wis. Oct. 27, 2020) ("[W]hile the CDC has identified obesity as a factor that puts an individual at an increased risk for severe illness from COVID-19, BMI alone provides little insight into a prisoner's physical condition.").

The PSR reported that defendant stands 6'4" tall and weighs 255 pounds (PSR ¶ 70), which produces a BMI of 31.0, barely qualifying him as obese.[3] The most recent medical records document a weight of 279.8 pounds, which produces a BMI of 34.1. (R. 84 at 3.) However, the CDC has acknowledged that BMI is a notoriously blunt tool with clinical

---

[2] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited February 15, 2021).

[3] The PSR further reported: "Mr. McMurtry stated he is healthy and has no history of significant illnesses, injuries or operations. At the time of the presentence interview, he was not under the care of a doctor or taking prescription medication. In addition, he was not under the care of a doctor or taking prescription medication before his arrest for the instant offense." (PSR ¶ 71.)

limitations, including its inability to differentiate between excess fat, muscle, and bone mass. Meyer, 2020 U.S. Dist. LEXIS 199117, at *20. In his motion, defendant makes no claim that he has suffered any adverse health effects due to his weight; nor do the medical records establish any such effects. To the contrary, he appears to be a physically fit young man, who engaged in an "aggressive weight lifting regimen" while incarcerated. (R. 84 at 15.)

The medical records submitted by the government indicate that defendant has been treated for back pain (R. 84 at 2-3), and in reply defendant speculates that his back pain is aggravated by his weight (R. 85 at 8), but he presents no medical evidence substantiating that claim. I also note that, while defendant alleged borderline hypertension in his request to the warden, he does not repeat that claim in his motion with the court. In any event, the medical records do not support such a claim. One record documents a blood pressure reading of 129/79 (R. 84 at 3), which is "elevated" but not "high."[4] Nowhere in the records is defendant diagnosed with hypertension.

The medical records further show that defendant's October 2020 COVID case was "asymptomatic." (R. 78-1 at 6; R. 84 at 7-8.) Defendant contends that the BOP failed to provide adequate treatment, but given the absence of symptoms it is unclear what more should have been done (other than regular monitoring, which the records confirm).

I accept that reinfection is possible, that a second case may prove more symptomatic than the first, and that it may be possible for an inmate who has recovered to nevertheless demonstrate grounds for release. As I indicated in United States v. Hicks, No. 18-CR-227, 2020 U.S. Dist. LEXIS 213100, at *17 (E.D. Wis. Oct. 7, 2020):

---

[4]https://www.webmd.com/hypertension-high-blood-pressure/guide/diastolic-and-systolic-blood-pressure-know-your-numbers#1 (last visited February 15, 2021).

11

> Given this uncertainty [regarding reinfection], it would be unwise to adopt a rigid rule, e.g., that a person who has recovered can never demonstrate extraordinary and compelling reasons. Moreover, § 3582(c)(1)(A)(i) envisions an individualized determination, which should include consideration of the prisoner's specific medical problems and their severity, the course of his recovery from the virus, whether he displays any lingering symptoms or effects, and the conditions at his particular facility.

In this case, defendant's medical conditions do not seem severe, his course of recovery from the virus appeared to be uneventful, and in his motion defendant alleged no lingering symptoms or effects. In reply, defendant claims that since his positive test he has experienced an array of symptoms, such as sore throat, body aches, and headaches. (R. 85 at 2.) The medical records indicate that defendant denied all such symptoms while recovering from the virus (R. 84 at 7-8), and defendant presents no medical evidence in reply substantiating this new claim. The record he does present discusses his back pain, which he attributed to a previous injury. (R. 85 at 8, 17.)

Finally, the conditions at defendant's facility are much improved since the October 2020 outbreak. The government notes that, as of the date of its response, FCI Oxford reported zero positive inmates and five positive staff. (R. 82 at 2, 7-8.) The most recent data from the BOP report 2 positive inmates, 0 positive staff, 0 inmate deaths, 0 staff deaths, 702 inmates recovered, and 75 staff recovered.[5] While Oxford experience a severe outbreak last fall, see United States v. Ricks, No. 17-CR-141, 2020 U.S. Dist. LEXIS 213101, at *17 (E.D. Wis. Oct. 13, 2020), things seem much better at this facility now.

In sum, defendant has failed to demonstrate extraordinary and compelling reasons for release. For the sake of completeness, I briefly discuss the § 3553(a) factors.

---

[5] https://www.bop.gov/coronavirus/ (last visited February 15, 2021).

### 3. Section 3553(a) Factors

Defendant contends that he has served more than ½ of his sentence, which is sufficient to satisfy the purposes of sentencing. (R. 78 at 16.) Pointing to his positive prison record, he further contends that he will pose no danger to the public if released, with or without home confinement. (R. 78 at 16-17.)

Reducing defendant's sentence would depreciate the seriousness of his crimes. While the robbers did not injure anyone and took little money, these were still serious offenses, in which the victim-employees were menaced with firearms, including the loaded semi-automatic handgun with an extended magazine defendant brandished. Defendant argues in reply that the sentence has been more punitive due to COVID-19 related restrictions on recreation, visitation, and programming. (R. 85 at 11-12.) All prisoners have faced such deprivations during the pandemic, and defendant develops no argument that his experience has been particularly severe.

Reducing the term could also endanger the public and diminish the deterrent effect of the sentence. Although defendant was just 25 at the time of sentencing, he had already compiled a serious prior record. In 2009, he was convicted of possession of a short-barreled shotgun, for which he was sentenced to 1 year in prison and 3 years of extended supervision. He was then convicted of burglary in 2011, for which he was sentenced to 18 months in prison followed by 3 years extended supervision. During this burglary a variety of items were stolen from a residence, including two handguns. While defendant appears to have done well in prison, nothing in the record suggests that his efforts have been unusual or extraordinary, or that they outweigh the risk suggested by his record.

13

### 4. Home Confinement

In the alternative, defendant seeks a recommendation that he be transferred to home confinement under the CARES Act, arguing that he meets the criteria for such placement. (R. 78 at 1, 14-15.) The government responds that defendant is not eligible, given his "medium" risk score and his commission of a "crime of violence." (R. 82 at 14.)

The BOP has plenary control over inmate placement; a district court may only recommend a new placement; it may not order it. Saunders, 2021 U.S. App. LEXIS 3398, at *5. While defendant appears to seek only a recommendation for home confinement, rather than an order, he provides no reason for this court to intrude into the BOP's exercise of discretion during the pandemic.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that defendant's motion (R. 78) is denied. The government's motion to seal medical records (R. 83) is granted.

Dated at Milwaukee, Wisconsin, this 16th day of February, 2021.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge

14